388 A.2d 297

**In re Distribution of Proceeds from Sheriff's Sale of Premises 250 BELL ROAD, LOWER MERION TOWNSHIP, MONTGOMERY COUNTY, Pennsylvania.**

**Appeal of John H. McCOY and William L. O'Hey, Jr., in No. 289.**

**Appeal of BOENNING & SCATTERGOOD, INC., in No. 322.**

Supreme Court of Pennsylvania.

Argued Oct. 18, 1977.

Decided April 28, 1978.

As Corrected on Clarification and Denial of Reargument July 5, 1978.

---

Henderson, Wetherill, O'Hey & Horsey, Edward Fackenthal, Norristown, for appellants at No. 289 and appellees at No. 322.

Waters, Fleer, Cooper & Gallagher, Thomas E. Waters, Norristown, Rawle & Henderson, George M. Brodhead, L. Carter Anderson, Philadelphia, for appellant at No. 322 and appellee at No. 289.

Edward N. Kurland, Philadelphia, for appellee, Jay Vending, Inc.

Charles Blasband, Norristown, for appellee, Michael Margolies.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

This case involves two appeals from an order of the Superior Court reversing an order of the Court of Common Pleas of Montgomery County. The Court of Common Pleas sustained exceptions to a sheriff's schedule of distribution of proceeds from the sale of real estate. In dispute is the allocation of such proceeds among competing creditors of the property owners.

The parties to this appeal are appellants, Boenning and Scattergood, Inc. [Hereinafter: Boenning], holder of a 1966 judgment, and John H. McCoy, holder of a 1971 mortgage, and appellees, Michael Margolies, holder of a 1971 mortgage dated later than McCoy's, Jay Vending, holder of a 1973 judgment, and William L. O'Hey, Jr., also holder of a 1973 judgment.

The controversy arises from the following facts:

On April 14, 1966, Boenning entered judgment on a note for $30,500 against John and Helen Jennings [Hereinafter: Jennings] in the Court of Common Pleas of Montgomery County. On July 3, 1970, Boenning initiated execution proceedings against real property owned by Jennings at 250 Bell Road, Lower Merion Township, Montgomery County. Although issued, the writ of execution was never recorded in the judgment index. Thereafter, Jennings, in an attempt to challenge the underlying debt, moved to open judgment and requested a stay order. The stay was issued on July 13, 1970, pending resolution of the judgment's validity. On July 29, 1972, the stay order was discharged by the trial court,

and that dismissal was affirmed per curiam by the Superior Court in *Boenning & Company v. Jennings,* 222 Pa.Super. 712, 294 A.2d 739 (1972).

Boenning immediately reinstituted execution proceedings by securing a second writ on August 23, 1972, which it again did not index. Jennings obtained an injunction from the United States District Court for the Eastern District of Pennsylvania staying execution proceedings; in December, 1973, however, the United States Court of Appeals for the Third Circuit reversed. *Jennings v. Boenning & Co.,* 482 F.2d 1128 (3rd Cir. 1973).

Boenning then instituted its third execution—again, without indexing the writ—and the property was listed for sheriff's sale on February 20, 1974. On that day, the property was also scheduled for sale as a result of foreclosure of a first mortgage held by The Equitable Life Assurance Society. The property was sold on the scheduled date pursuant to Equitable's writ, and the sum of $85,000 was realized from the sale. Certain liens for taxes, costs of execution, and the first mortgage of Equitable had undisputed priority to the proceeds of the sale. After satisfaction of these claims, the sum of $66,679.50, which was insufficient to pay the remaining creditors in full, was available for distribution. Accordingly, the matter in controversy is the validity and priority of the competing liens.

The liens being asserted against the remaining funds are as follows:

| Debt | Date of Lien | Approx. Amt. with Interest |
|------|--------------|---------------------------|
| 1. Boenning Judgment | April 1966 | $48,500.00 |
| 2. McCoy Mortgage | August 1971 | 30,000.00 |
| 3. Margolies Mortgage | December 1971 | 17,500.00 |
| 4. Jay Vending Co. Judgment | June 19, 1973 | 21,000.00 |
| 5. McCoy Judgment | June 20, 1973 | 1,300.00 |
| 6. O'Hey Judgment | June 20,1973 | 21,000.00 |

McCoy's mortgage was executed and recorded on August 6, 1971, more than five years after entry of the Boenning judgment, while execution proceedings on that judgment

were stayed pending disposition of Jennings' petition to open judgment. Depositions disclose that, at the time of his mortgage, McCoy was aware of the Boenning lien and knew that it would have priority over his mortgage unless Jennings was successful in challenging the debt. McCoy's attorney was a partner in a law firm which also represented Jennings against Boenning. McCoy accepted a second mortgage on Jennings' realty on counsel's assurances that the Boenning lien would be invalidated.

The Margolies mortgage was recorded on December 22, 1971. Jay Vending entered judgment against Helen Jennings on June 19, 1973. Like the McCoy lien, both of these liens appeared of record more than five years after entry of the Boenning judgment; but unlike McCoy, there was no showing that the lienholders had any knowledge of the Boenning judgment or the proceedings to open.

The Boenning judgment had been entered in the judgment index more than seven years prior to the sheriff's sale on February 20, 1973. Accordingly, Boenning was not included in the proposed schedule of distribution. Boenning filed exceptions to the schedule claiming that its lien was valid and had been improperly omitted. The Court of Common Pleas sustained the exceptions on the theory that Boenning's judgment lien was revived as to McCoy because the latter had actual knowledge that a writ of execution on the judgment had been issued and docketed within five years of the judgment. Thus, the court held that the claim of McCoy was junior to that of Boenning despite Boenning's failure to index his writ of execution.[1]

1. McCoy contends that Boenning's lien expired because it was not indexed and therefore did not fully comply with the requirements of the Judgment Lien Law of 1947, Act of July 3, 1947, P.L. 1234, 12 P.S. § 877 *et seq.* In pertinent part, the Act provides that a judgment, when entered of record and indexed in any court of record, creates a lien upon realty within the county for a period of five years and no longer unless revived in accordance with specified procedures. 12 P.S. § 878. One of the procedures for revival is issuing execution against the realty and indexing the writ. 12 P.S. § 883. Boenning issued execution within five years of the judgment, but did not index the writ.

However, the court also found that Boenning's lien was not revived against subsequent creditors with no actual knowledge of the execution proceedings. The court, therefore, concluded that, while Boenning was superior to McCoy who, in turn preceded Margolies and Jay Vending, the latter two creditors should take before Boenning. This order of rank results in a circular lien, with A (Boenning) having priority over B (McCoy) and B having priority over C (Margolies and Jay Vending), but C having priority over A.

The Court of Common Pleas applied the Pennsylvania temporal priority rule to break the circle and realign the parties: first in time, first in right.[2] Accordingly, the court directed that Boenning's lien be included in the distribution of proceeds and be given priority over all other liens.

On appeal by the remaining parties, the Superior Court reversed and applied a different rule. The court ordered that distribution be made according to a formula applied in *Day v. Munson,* 14 Ohio St. 488 (1863), and advocated by Judge Dixon, dissenting in *Hoag v. Sayre,* 33 N.J.Eq. 552 (1881). As applied, the formula gave priority to Jay Vending and Margolies over Boenning to the extent that the sale proceeds exceeded the amount of McCoy's lien. Consequently, the Superior Court ordered distribution as follows:

Both the Court of Common Pleas and the Superior Court concluded that the indexing of a writ of execution is not essential to the revival of a judgment where there is actual knowledge of the writ by a subsequent creditor. We agree. Our conclusion as to the Judgment Lien Law follows from a fundamental rule in construing recording laws generally: *viz.,* that actual notice of an unrecorded instrument, if received by a subsequent lienor before his interest attaches, is equivalent to the constructive notice which recording provides. *Russeck v. Shapiro,* 170 Pa.Super. 89, 84 A.2d 514 (1951); *Lambert v. K-Y Transportation Co.,* 113 Pa.Super. 82, 172 A. 180 (1934); *Coral Gables, Inc. v. Kerl,* 334 Pa. 441, 9 A.2d 357 (1939); *Manufacturers' & Mechanics' Bank v. Bank of Pennsylvania,* 7 Watts & S. 335 (Pa. 1844); *Parker v. Wood,* 1 U.S. (Dall.) 436, 1 L.Ed. 212 (Pa.1789); 45 Am.Jur., Records and Recording Laws § 172.

**2.** The Pennsylvania method of distribution was established in several early cases: *Wilcocks v. Waln,* 10 Serg. & R. 380 (Pa.1824); *Manufacturers' & Mechanics' Bank v. Bank of Pennsylvania, supra; Thomas' Appeal,* 69 Pa. 120 (1871); *Miller's Appeal,* 122 Pa. 95, 15 A. 672 (1888); *Dowling v. Vallett,* 70 Pa.Super. 481 (1918).

| | |
|---|---|
| 1. Boenning Judgment | $13,470.50 |
| 2. Strawbridge and Clothier Judgment (Undisputed) | 1,650.00 |
| 3. McCoy Mortgage | 16,529.50 |
| 4. Margolies Mortgage | 17,500.00 |
| 5. Jay Vending Co. Judgment | 17,529.50 |
| | $66,679.50 |

The issue before us is to determine the applicable rule of distribution in a circular lien situation which arose from the failure of one party to make a required filing. For the reasons hereinafter stated, we hold that the subordination rule is to be applied where the circuity results from a failure to file.

There are at least three situations out of which a circular lien may arise: (1) where the first of three or more claimants waives his priority in favor of another claimant; (2) where there are inconsistent statutory or judicial rules of priority; and, (3) where one of the claimants fails to make a required filing. Pennsylvania has applied the temporal priority rule of distribution in all three situations.[3] We are

3. The failure of any Pennsylvania case to distinguish among waiver, inconsistent rules of priority, and failure-to-file situations is criticized in Brown, *Execution Sales: Lien Divestiture and Distribution,* 58 Dickinson Law Review 244, 266–67 (1953).

For application of the rule in cases of waiver, *see Thomas' Appeal, supra; Miller's Appeal, supra.* For application of the rule to a circuity caused by inconsistent rules of priority, *see Wilcocks v. Waln, supra.* For application of the rule in cases involving failure to file, *see Manufacturers' & Mechanics' Bank v. Bank of Pennsylvania, supra; Dowling v. Vallett, supra.*

Whether, in fact, the Pennsylvania rule of temporal priority has ever been applied to a failure-to-file circuity is open to question since it can be argued that *Manufacturers'* and *Dowling* present a fourth type of circuity—*viz.,* one arising from technical imperfections in filing. In *Manufacturers'* a mortgage was recorded in the wrong county and in *Dowling* a judgment was indexed under the name of Caroline A. Parks, while the realty to which it attached was owned under the name of Caroline Parks.

We do not think, however, that cases involving improper recording should constitute a fourth class of circuity. The person offering an instrument for record has a duty to see that it is properly recorded and properly indexed, and cannot hide behind a mistake of the recorder. *Commonwealth v. Roberts,* 392 Pa. 572, 141 A.2d 393

now concerned only with the failure-to-file situation and expressly confine today's holding to that type of circuity.

A circularity involving failure-to-file arises from the operation of Pennsylvania's race-notice recording system where proper recording of an interest or lien is necessary for priority as to all except those with actual notice of the prior lien.[4]  Successive mortgages may be used to illustrate:  A takes a first mortgage which he fails to file.  B takes a second mortgage, with notice of the mortgage to A, and files.  C takes a third mortgage, without notice of the mortgage to A.  A has priority over B (because of B's knowledge);  B has priority over C because of prior filing;  C has priority over A (because of A's failure to file and C's lack of knowledge).  In this situation, the circularity arises because of A's failure to file.  On a theory of *fault,* A seems to be the appropriate person to bear the loss.

■ However, the opposite result is reached by the Pennsylvania temporal priority rule, with C bearing the loss. The Pennsylvania approach is to revert to the common law rule that "first in time is first in right" and distribute the fund to the competing claimants in the chronological order of their claims.  A rationale for the Pennsylvania rule was supplied in *Dowling v. Vallett,* 70 Pa.Super. 481, 484 (1918) (citations omitted);

(1958);  *Prouty v. Marshall,* 225 Pa. 570, 74 A. 550 (1909);  24 P.L.E. § 109;  45 Am.Jur., Records and Recording Laws, § 114.

In our view, the technical imperfections in *Manufacturers'* and *Dowling* amount to a failure to file.  Accordingly, the circular liens presented in those cases fall within the third type of circuity—*viz.,* that arising from the failure of one party to make a required filing. Because we now adopt the subordination rule for circuities involving failure to file, to the extent *Manufacturers'* and *Dowling* are inconsistent with our holding, they are overruled.

4. *See, e. g.,* Act of May 12, 1925, P.L. 613, § 1, *as amended* by Act of June 12, 1931, P.L. 558, No. 191, § 1, 21 P.S. § 351.  That statute provides that an unfiled mortgage is subordinate to subsequent recorded interests if the persons holding the recorded interests are not chargeable with knowledge of the unfiled interest, but that an unfiled mortgage maintains priority over later recorded interests if the persons holding the recorded interests are chargeable with such knowledge.

"The last of three or more liens in the order of their succession being superior to the first but inferior to the second gains no practical advantage from its superiority, because it could not be preferred to the first without being preferred also to the second, to which it is subsequent. . . ."

The Pennsylvania method gives A, who is paid first, an unwarranted advantage over C whose priority over A is disregarded. B is treated fairly because the fund is applied to pay his claim after A's prior claim has been paid. C is treated unfairly because he is paid only after A and B have been paid in full, even though A's unfiled mortgage has, according to the filing statute, become "void" as to C who, by hypothesis, came in without knowledge of A.[5]

A seemingly more equitable method of distribution than the Pennsylvania rule was adopted by the Superior Court in this case. The court applied a formula used to distribute proceeds in *Day v. Munson, supra,* and detailed as follows by Judge Dixon dissenting in *Hoag v. Sayre, supra* at 562–63:

"1. Deduct from the whole fund the amount of B's lien, and apply the balance to pay C. This gives C just what he would have if A had no existence.

2. Deduct from the whole fund the amount of A's lien, and apply the balance to pay B. This gives B what he is entitled to.

3. The balance remaining after these payments are made to B and C is to be applied to A's lien."

**5.** The Pennsylvania method is one of two approaches to fault-based circuity problems which involve breaking the circle and arbitrarily realigning the parties in a new order of priority. The other, known as the New Jersey method, realigns the parties in the order of B–C–A, thus penalizing A's failure to file by putting him last. The New Jersey rule ignores the fact that A was entitled to priority over B who, by hypothesis, had knowledge of A's lien. Of the two arbitrary rules of distribution, the New Jersey B–C–A rule has a greater following than the Pennsylvania A–B–C rule. *See* Benson, *Circuity of Lien—A Problem in Priorities,* 19 Minn.L.Rev. 139, 142 (1935); Note, 38 Columbia L.Rev. 1267, 1269 (1938).

The following rationale for the Dixon formula has been suggested.[6] The Dixon approach is designed to satisfy the reasonable expectations of the parties. B bargained for the fund minus A's claim and C bargained for the fund minus B's claim. Each is entitled to share as a junior lienholder. A's expectation was to be a first lienholder, but his failure to record deprives him of this position in so far as it is necessary to protect the other claimants.[7]

The principal defect of the Dixon formula is that is produces disparate results depending on the size of the fund and the amounts of competing claims. When the fund is small, A may take the entire amount while B and C receive nothing. As the fund increases, A's share decreases until B's and C's claims have been paid in full.[8] Thus, the results arrived at by using the Dixon formula can be as inequitable as those produced by the Pennsylvania rule.[9] Neither the

6. *See* 38 Columbia L.Rev. at 1268.

7. It may be argued that A had a reasonable expectation of coming after C alone, *i. e.,* after any subsequent takers without notice. In that case, A should also be treated as a junior lienholder. Professor Benson has devised a complicated formula designed to meet this objection. 19 Minn.L.Rev. 139.

8. These disparate results occur because neither B nor C receives anything as a junior lienor until the fund exceeds the claim which is senior to his. Thus, A who takes the residue is the winner until the fund exceeds one or both of the claims; as the fund increases the junior lien shares grow larger and A's share shrinks until it reaches zero at the point when the junior lien claims equal the fund.

   Operation of the Dixon rule may be illustrated as follows: The mortgage of A (who has failed to record) is for $1,000; B's mortgage is for $2,000; C's for $3,000. If the property sells for $1,000, A is paid in full; likewise, if it sells for $2,000. At $3,000, A gets nothing. These results are reached because: (1) when the fund is $1,000, neither B nor C has any junior lienholder's claim, and A takes the whole sum; (2) when the fund is $2,000, B has a junior lienholder's claim of $1,000, C has no junior lienholder's claims, and A takes the remaining $1,000; and, (3) when the fund is $3,000, B has a junior lienholder's claim of $2,000, and C of $1,000, thus consuming the whole fund. From this point on, A gets nothing until B's and C's claims are fully satisfied, *i. e.,* at any point up to $5,000, the point at which B and C can be fully paid, their junior lienholder's claims equal the fund.

9. In the 1930's three law review articles appeared which praised Dixon's formula as ingenious but judged it imperfect and inadequate

Dixon formula nor any of the substitute formulas based on Dixon has been applied by any court.[10]  *See* n.9, *supra.*

█ By contrast, many jurisdictions have used the subordination rule to resolve all three types of circuities.  In most jurisdictions, the subordination rule is the generally accepted solution in cases of circularity which result from a waiver agreement.[11]  It also is the rule most frequently applied to resolve circuities arising by operation of law.[12]  The rule was also applied in many of the older failure-to-file circularity cases.[13]

to solve the circuity problem.  Each author prescribed a substitute formula designed to cure the Dixon formula's defects.  Benson, *Circuity of Lien—A Problem in Priorities,* 19 Minn.L.Rev. 139 (1935); Note, 38 Colum.L.Rev. 1267 (1938); Kocourek, *A First-Rate Legal Puzzle—A Problem in Priorities,* 29 Ill.L.Rev. 952 (1935).  Gilmore, *Circular Priority Systems,* 71 Yale L.J. 53, at 58–63, evaluates each of these attempts to provide a theoretical solution to the circuity problem and concludes that they are all impractical.  Moreover, he expresses doubt that the results achieved by their use would approximate the reasonable expectations of the parties.

**10.** Essentially the same approach was used by an Ohio court in *Day v. Munson, supra,* but Benson, *supra,* at 145, notes that Ohio substituted the *Bacon v. Van Schoonhoven* (subordination) method for the *Day* method in later cases.

**11.** *See, e. g., Wayne Int'l. Bldg. & Loan Ass'n. v. Moats,* 149 Ind. 123, 48 N.E. 793 (1897); *Fidelity Union Title & Mortgage Guar. Co. v. Magnifico,* 106 N.J.Eq. 559, 151 A. 499 (Ch. 1930); *Malmgren v. Phinney,* 50 Minn. 457, 52 N.W. 915 (1892).  *But see* n.3, *supra.*

**12.** *See, e. g., Samms v. Chicago Title & Trust Company,* 349 Ill.App. 413, 111 N.E.2d 172 (1953); *Exchange Bank & Trust Co. v. Tubbs Mfg. Co.,* 246 F.2d 141 (5th Cir. 1957), *cert. denied,* 355 U.S. 868, 78 S.Ct. 118, 2 L.Ed.2d 75 (1957); *California State Dep't. of Employment v. United States,* 210 F.2d 242 (9th Cir. 1954); *In the Matter of American Zyloptic Co.,* 181 F.Supp. 77 (E.D.N.Y.1960).  Gilmore, 71 Yale L.J. at 64, notes that the circular lien arising by operation of law had become the most frequently litigated type of circuity.  He states that between 1940 and 1961 every circular lien case reported arose from inconsistent rules of priority, and that the most popular solution for these cases has been the subordination rule.  *But see* n.3, *supra.*

**13.** *See, e. g., Hoag v. Sayre,* 33 N.J.Eq. 552 (1881) (Dixon, J., dissenting); *Dyson v. Simmons,* 48 Md. 207 (1877); *Miller v. Stoddard,* 54 Minn. 486, 56 N.W. 131 (1893); *Neff's Adm'r. v. Newman,* 150 Va. 203, 142 S.E. 389 (1928).  Gilmore, 71 Yale L.J. at 64, suggests that

Where the subordination rule is applied, the amount of A's claim is set aside from the fund to pay C and the balance, if any, is paid to A; thereafter, the balance of the fund, if any, is paid to B; the remaining balance, if any, is paid to C and A in that order.

Thus, C, by virtue of the subordination agreement, is paid first, but only to the amount of A's claim, to which B was in any event junior. B receives what he had expected to receive: the fund less A's prior claim. If A's claim is smaller than C's, C will collect the balance of his claim only after B has been paid in full. A, the subordinator, receives nothing until B and C have been paid except to the extent that his claim exceeds the amount of C's claim.

In applying the subordination rule to a failure-to-file circuity, subordination of A, the nonfiler who is at fault, is the obvious choice and C is the obvious choice to receive the benefit of the subordination because he took without knowledge.

The subordination rule is, admittedly, subject to the same criticism made of the Dixon formula—*viz.,* that it produces anomalous results in actual distributions. For example, under the subordination rule, B, who gets nothing when A's claims equals or exceeds the fund, progressively moves to a better position as A's claim decreases. C is in the opposite position; the larger A's claim, the better C fares. Whether or not A takes anything depends on the size of C's claim: whenever C's claim equals or exceeds A's, A takes nothing until B and C have been paid in full; the smaller C's claim, the more A takes.

The subordination rule is, however, superior to Dixon in one important respect, *i. e.,* under no circumstance can A, the party most at fault, take the entire fund while B and C receive nothing, a hazard which is inherent in the Dixon

the subordination rule is an appropriate solution for the failure-to-file type of circuity. He notes the absence of reported cases of circuity involving failure to file in the period 1940 to 1961. He attributes this simply to the "accident of litigation" and prophetically speculates that the failure-to-file circuity will one day reappear.

formula. Moreover, the results which the subordination rule produce are no less predictable or less equitable then those produced by the Dixon formula. Furthermore, when the subordination rule is applied to a circuity situation involving fault, *i. e.,* neglect in failing to file or in imperfect filing, the nonfiler bears the loss. This is an equitable result in contrast to that produced by the Pennsylvania rule.

Therefore, the record is remanded to the Court of Common Pleas of Montgomery County for distribution consistent with this opinion following a determination of the validity of the Margolies mortgage.

MANDERINO, J., concurs in the result.

PACKEL, J., did not participate in the decision of this case.